**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN THE MATTER OF:** | : | **CIVIL ACTION** |
| | : | |
| **GREEN GOBLIN, INC.** | : | |
| | | |
| **GREEN GOBLIN, INC.** | : | |
| | : | |
| **Appellant,** | : | |
| | : | |
| **v.** | : | **NO. 12-4076** |
| | : | |
| **WARREN SIMONS** | : | |
| | : | |
| **Appellee** | : | |

FILED

NOV ⎻ 6 2014

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

**STENGEL, J.**                                           November 6, 2014

## MEMORANDUM

### I.    INTRODUCTION

Green Goblin, Inc. ("GGI") appeals from a decision of the United States Bankruptcy Court for the Eastern District of Pennsylvania in an adversary proceeding it brought against Warren Simons ("Simons"), the assignee of a note GGI executed as part of an agreement to open a Gold's Gym franchise club in King of Prussia, Pennsylvania. Since it is clear that Simons breached no promise contained in his assignor's contract with GGI, I conclude that the Bankruptcy Judge's determination that GGI failed to prove the elements of a contract claim was correct. Accordingly, the decision of the Bankruptcy Judge is affirmed.[1]

---

[1] I note that Simons argues that there are numerous alternate ways by which the decision of the Bankruptcy Judge could be affirmed. I do not discuss these alternatives, with one exception, since I find that the reasoning the Bankruptcy Judge actually used was correct. The exception is Simons' claim that GGI's adversary action should have been dismissed for lack of jurisdiction. Since jurisdiction is always an issue, see Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 76-77 (3d Cir. 2003) (subject matter jurisdiction is non-waivable, and courts always have an

## II.   STANDARD OF REVIEW

The standard of review for a district court sitting in review of a Bankruptcy Court decision is "clearly erroneous" with regard to factual findings, and plenary with regard to legal findings. See, e.g., American Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999); Fed. R. Bankr. Proc. 8013. Under Rule 8013, a District Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

## III.   PROCEDURAL BACKGROUND

The adversary proceeding originally included three Plaintiffs, each of whom were Chapter 11 Debtors:  Venom, Inc. ("Venom"), Sabertooth LLC ("Sabertooth"), and GGI (collectively "the Debtors").   The adversary proceeding originally named two defendants, Warren Simons and Alan Simons. Venom and Alan Simons were later dismissed as parties. The two remaining Plaintiffs filed a Second Amended Complaint ("SAC") against Simons alleging a breach of contract arising from his having confessed judgment in the Court of Common Pleas of Montgomery County against Sabertooth, even though he was allegedly prohibited from doing so under the parties' contract. After discovery, Sabertooth and GGI filed a motion for partial summary judgment on the issue of liability, and Simons filed a response that the Bankruptcy Judge treated as a cross-motion for summary judgment on liability. Simons also filed a cross-motion for summary judgment on damages. While those motions were pending, the Bankruptcy Judge *sua sponte* raised the issue whether the court had subject matter jurisdiction over the

---

obligation to satisfy themselves that such jurisdiction exists) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977)), I will discuss that argument.

adversary proceeding under the Rooker-Feldman doctrine,[2] and gave the parties the opportunity to brief that issue.

The Bankruptcy Judge issued an Opinion on January 18, 2011 ("the Summary Judgment Opinion), holding that (1) under the Rooker-Feldman doctrine it lacked subject matter jurisdiction over Sabertooth's claim; (2) the doctrine did not affect subject matter jurisdiction over GGI's claim; (3) Simons was entitled to summary judgment on GGI's claim that he breached one of the contracts, the Standby Creditor's Agreement; (4) another of the contracts Simons allegedly breached, a promissory note, was ambiguous, thereby rendering summary judgment for either party inappropriate; and (5) Simons' motion or partial summary judgment on damages would be denied. (R. 5.) A bifurcated trial on the remaining claims was held on September 8, 2011; on May 11, 2012, the Bankruptcy Judge issued an Opinion granting judgment to Simons and against GGI on GGI's remaining claim ("the Trial Opinion"). (R. 8.) GGI filed a timely motion for reconsideration, which was denied by Order of May 31, 2012. (R. 9.) GGI then filed a timely notice of appeal to this court.

## IV.  FACTS[3]

The three Debtors are all owed by the same three principals, Kevin Burke, Teresa Burke, and John DePrince (collectively "the Principals"). Venom owned and operated the Principals' Gold Gym franchise in Conshohocken, Pennsylvania. Sabertooth was formed in July 2000, to

---

[2] See Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483-84 (1983). The Rooker-Feldman doctrine divests a lower federal court of subject matter jurisdiction of an action if the relief requested would effectively reverse a state court decision or void its ruling. See, e.g., Turner v. Crawford Square Apts. III, L.P., 449 F.3d 542, 547 (3d Cir. 2006); In re Knapper, 407 F.3d 573, 580 (3d Cir. 2005).

[3] Unless otherwise noted, all facts are taken from the Bankruptcy Judge's January 18, 2011 Summary Judgment Opinion (R. 5) and the May 11, 2012 Trial Opinion (R. 8).

purchase and own the real property on which the Principals intended to operate a second Gold's Gym franchise in King of Prussia. GGI was the purchaser of the assets located on the property, including a building and personal property located therein ("the business assets"), and was the operating entity for the second franchise. Joseph and Anne Proietto ("the Proiettos") were the sellers of the property. In January 2001, the Debtors hired attorney Edward J. Hughes to represent them in negotiating the purchase. The Proiettos were represented by Attorney Joseph J. Pizonka.

The Debtors entered into negotiations with Harleysville National Bank and Trust Company and with Business Loan Center, Inc. ("BLC"), to finance the transaction. The BLC loan was to be guaranteed by the United States Small Business Administration. The Debtors did not qualify for the full amount of the loan that they sought from BLC. They received a commitment from BLC in May 2001 for a $1.3 million loan, subject to certain conditions. The condition at issue in this appeal was that the Proiettos finance $600,000 of the purchase in the form of a subordinated note. That note was required to be on "standby" for a period of at least two years, and thereafter, the Debtors would be required to meet certain financial markers before being obligated to make payments on the subordinated note. While the Proiettos' loan was secured by a third priority mortgage, BLC required that they defer taking any legal action to collect their loan or realize their collateral before full repayment of BLC's loan. The Debtors and Joseph Proietto attended a meeting with BLC in mid-May 2001 to discuss these terms and conditions.

The transaction closed on June 26 and 27, 2001. Sabertooth purchased the real estate for $2.5 million and GGI purchased the business assets for $600,000. The Debtors utilized three

4

sources for financing the transaction: a $1.5 million loan from Harleysville to Sabertooth secured by a first priority mortgage; a $1.3 million BLC loan to Sabertooth and GGI secured by a second priority mortgage; and a $600,000 loan from the Proiettos secured by a third position mortgage. The Proiettos' third priority loan was documented by a series of contracts: (1) GGI executed a promissory note in the amount of $475,000 in favor of the Proiettos guaranteed by Sabertooth; (2) Sabertooth gave the Proiettos a $125,000 promissory note; and (3) the two Notes and the guarantee were secured by the third priority mortgage listing Sabertooth as the mortgagor ("the Sabertooth Mortgage"). The Sabertooth Mortgage contained a confession of judgment clause permitting the Proiettos to confess judgment against Sabertooth in the event of default. The Notes provided for repayment to occur in sixty consecutive monthly installments, commencing on August 1, 2001, "with a final payment of all then outstanding principal and all unpaid and accrued interest due and payable on the sixty month anniversary of this Note."

Each of the Notes specifically referenced two other agreements, the Standby Creditors Agreements ("the Standby") executed on the same day. The Notes each stated:

> In accordance with a certain Standby Creditors Agreement dated this date and executed by Payees ("the Standby Agreement"), no principal or interest payments for the first two (2) years from the date of this [sic] Notes shall be made and payment of principal and interest will be permitted only after the occurrence of: (a) two (2) years having passed from the date of the Note and (b) Maker shall show on a consolidated basis two (2) years of 1.25:1 cash flow/debt service coverage as defined by generally accepted accounting principles. When principal and interest payments are permitted to be made under the Standby Agreement, Maker shall pay to Payees all accrued and unpaid interest and principal then due in accordance with the Amortization Schedule.

In the Standby, which was drafted by BLC and which BLC required the Proiettos to execute to induce BLC to make an SBA guaranteed loan to the Debtors, the Proiettos promised BLC:

5

1.      To accept payment of principal and interest [under the GGI Note] after the occurrence of:

      a.      two years having passed from the date of the closing; and

      b.      Standby Borrower [GGI] showing on a consolidated basis and acknowledged by Lender, two years of 1.25:1 cash flow/debt service coverage as defined by Generally Accepted Accounting Principles

. . .

3.      To take no action to enforce claims against Standby Borrower [GGI] on the Standby Loan until Lender's Loan is satisfied.

4.      To take no action against Standby Borrower's [GGI's] collateral, without written consent from the Lender, until Lender's Loan is satisfied.

. . .

7.      This Agreement applies to any successor to the Standby Creditor or assignee of this Agreement or of Standby Creditor's Loan, including any bankruptcy trustee or receiver or guarantors or sureties of Standby Creditor Loan.

Neither Sabertooth nor GGI was a signatory to the Standby executed by the Proiettos. Finally, the Sabertooth Mortgage included a confession of judgment provision, authorizing the entry of judgment by confession against Sabertooth in the event of "any default" of any provision of the Sabertooth Note or the Sabertooth Mortgage.

The two Notes, and most of the other documents for the transaction, were drafted by the Debtors' Attorney Edward J. Hughes. Hughes added the language to the Notes referencing the Standby. Hughes intended the agreements to be complete, integrated documents. The two Notes were sent by Hughes to Attorney Pizonka. Hughes and Pizonka discussed the fact that, unless the Proiettos agreed to be bound by the Standby, BLC would not provide financing to the Debtors.

The Proiettos assigned the two Notes and the third priority Sabertooth Mortgage to Appellee Simons on April 27, 2006, for $1.00. At that time, Debtors had made no payments to

6

the Proiettos. Simons filed a Complaint in Confession of Judgment against Sabertooth in the

Court of Common Pleas of Montgomery County on July 17, 2006. This date was after the 60

month anniversary of the two Notes. Simons also filed a Praecipe for a Writ of Execution, and a

sheriff's sale was scheduled for September 27, 2006. A notice of the sale was posted on the

property. Sabertooth filed a Petition to Open and/or Strike the Confession of Judgment on

August 14, 2006. The Common Pleas judge granted Sabertooth's Petition on March 4, 2011.

## V.   THE BANKRUPTCY COURT DECISIONS

In the Summary Judgment Opinion, the Bankruptcy Judge first determined that, although

Sabertooth's breach of contract claims against Simons were barred by the Rooker-Feldman

doctrine, GGI's breach of contract claims against Simons were not since GGI was not a party in

the state court confession of judgment proceeding.[4] Summary Judgment Opinion at 13. He then

went on to consider the merits of GGI's claim.

GGI's only claim against Simons was a breach of contract claim involving Simons' entry

of the confessed judgment and the commencement of execution proceedings against Sabertooth.

Simons took no collection action against GGI. Because the only contract between GGI and

Simons (in his capacity as the Proiettos' assignee) was the GGI Note, the Bankruptcy Judge

framed the issue in the Summary Judgment Opinion as follows: How is the GGI Note breached

by Simons' exercise of remedies under different contracts (the Sabertooth Note and the

Sabertooth Mortgage) to which GGI was not a party? The Bankruptcy Judge held that for GGI

to have a viable breach of contract claim against Simons based upon his exercise of his remedy

---

[4] Sabertooth's claim was essentially identical to GGI's claim, namely that Simons' filing the confession of judgment was a breach of his assignor's promise in the Standby. The Bankruptcy Judge concluded that the Rooker-Feldman doctrine applied to Sabertooth's claim because it sought to have the bankruptcy court overrule the state court judgment. Summary Judgment Opinion at 22.

rights against Sabertooth, GGI would have to show either (1) the Proiettos and GGI intended to

incorporate the limitations on Simons' rights and remedies found in the Sabertooth Note and/or

the Standby into the GGI Note, or (2) the Proiettos and BLC intended GGI to be a third party

beneficiary of the Standby.   Summary Judgment Opinion at 32.   After a discussion of the

Pennsylvania law applicable to breach of contract, disputes over the meaning and terms of a

contract, and contract integration, the Bankruptcy Judge noted that GGI argued that the GGI

Note, standing alone, was not a fully integrated contract, but that the parties supplemented its

provisions by orally incorporating terms from the Sabertooth loan documents, because all of the

components of the real property and asset purchases, including all of the agreements with all

three lenders, constituted a single integrated transaction. Id. at 34.

The Bankruptcy Judge concluded that issues of material fact precluded finding as a

matter of law whether the Proietto-GGI Note was fully integrated.   Specifically, he found a

material issue of fact whether that Note's terms were supplemented by the Standby:

> The [Proietto-GGI] Note was one, relatively modest, component of a
> multiparty commercial transaction in which Green Goblin and Sabertooth,
> acting both as borrowers and guarantors, and Venom, acting as a guarantor,
> obtained financing from three creditors for the purpose of purchasing a
> business and the real estate on which the business was situated.   As a
> condition of granting its loan, BLC, the second position creditor on the real
> estate, insisted that the remedies of the third position creditor, the Proiettos,
> be subordinated to BLC.   As a result, the Proiettos entered into two Standby
> Agreements with BLC, one for the Proietto-Green Goblin Note and the other
> for the Proietto-Sabertooth Note.   In the Standby Agreements, the Proiettos
> accepted certain restrictions on their right to payment under the Proietto
> Notes and their right to take legal action to enforce the Notes upon default.
> The restriction on the Proiettos' right to receive repayment was incorporated
> expressly in the Proietto-Green Goblin Note (i.e., the "cash flow/debt service
> ratio" condition precedent to payment).   The restriction on the exercise of
> legal remedies upon default was not (i.e., the Proiettos' promise found in
> Paragraphs 3 and 4 of the Standby Agreements to take no action to enforce
> the Proietto-Sabertooth Note or the Sabertooth Mortgage until BLC is paid in
> full).   In this context, I conclude that Green Goblin's factual assertion, that its

8

agreement with the Proiettos also included the restrictions found in Paragraphs 3 and 4 of the Sabertooth Standby Agreement, potentially satisfies both parts of the test set forth in Restatement [Second of Contracts] § 216(2)[5] for determining whether a contract is not fully integrated (i.e., that it is (1) a consistent additional term that (2) might naturally be omitted from the writing).

. . .

I also am satisfied, based on the nature of the transaction as a whole that the second restriction from the Standby Agreements simply may have been omitted from the Proietto-Green Goblin Note notwithstanding the parties' intent to include the provision. It is not intuitive that the Proiettos would negotiate with Green Goblin and Sabertooth for the right to exercise their remedies in the Proietto Notes in circumstances that would breach their contract with and render them liable to BLC. It seems more natural for the parties to have intended that all of the loan documents contain parallel restrictions. Further, in light of the fact that Green Goblin and Sabertooth were part of a single business enterprise (Sabertooth owning the land on which Green Goblin operated the gym), Green Goblin had every incentive to make sure that Green Goblin and Sabertooth had corresponding protections in their respective loan agreements with the Proiettos.

These circumstances convince me that the Proietto-Green Goblin Note may not have been fully integrated and that there is a fact issue whether the parties intended to incorporate all of the restrictions found in the Sabertooth Standby Agreement into the Proietto-Green Goblin Note. . . . In reaching this result, I acknowledge that the express incorporation into the Proietto Notes of only one of the two restrictions of the Standby Agreements creates a plausible negative inference that [the] parties did not intend to incorporate the second restriction. However, it is only an inference, not an inexorable conclusion. In the totality of the circumstances of the transaction, I find that there is sufficient uncertainty regarding the relationship between the Proietto Notes and the Standby Agreements to create a triable issue of fact.

---

[5] The Restatement section provides:

(2) An agreement is not completely integrated if the writing omits a consistent additional agreed term which is

(a) agreed to for separate consideration, or

(b) such a term as in the circumstances might naturally be omitted from the writing.

Restatement Second of Contracts § 216(2).

Summary Judgment Opinion at 36-39. The Bankruptcy Judge went on to conclude as a matter of law that GGI was not a third party beneficiary of the Standby. Id. at 39. Thus the only question left for trial was whether the GGI Note was a fully integrated contract, or whether the parties intended to incorporate some or all of the remedy restrictions contained in the Standby.

In the Trial Opinion, the Bankruptcy Judge again took up the question of whether the GGI Note was not complete, in and of itself, and whether the parties intended to incorporate the provisions of the Standby.[6] Based upon the trial evidence, the Bankruptcy Judge found that the GGI Note was partially integrated and partially supplemented by the Standby; that the restrictions on the exercise of contract remedies contained in the Standby were incorporated into the GGI Note; however, the incorporated restrictions were contractual conditions precedent to the Proiettos' rights to exercise their remedies, and were not contractual promises that could give rise to damages for breach of contract. Accordingly, the Bankruptcy Judge concluded that Simons' exercise of those remedies gave rise only to a defense for GGI to the legal action he instituted, and not an affirmative claim for breach:

---

[6] Preliminary to this discussion, the Bankruptcy Judge found that GGI had failed to prove by a preponderance of the evidence its claim for breach of contract on the theory that Simons' violated the cash flow minimum ratio provision of the GGI Note. He stated:

> The Proietto-Green Goblin Note conditioned Green Goblin's payments on the occurrence of two (2) events: (a) two (2) years having passed from the date of the Proietto-Green Goblin Note ("the 2 Year Provision") and (b) the Cash Flow Minimum Ratio.
>
> As the party asserting the breach, Green Goblin had the burden of proving by a preponderance of the evidence that Simons confessed judgment at a time when Green Goblin was not in default. Green Goblin has failed to establish that, prior to the confession of judgment, it had not been operating for at least two (2) years, at or above, the required cash flow to debt service ratio. There is simply no evidence in the record on the subject and Simons has not conceded this issue.
>
> Therefore, having failed to establish an essential element of its claim, Green Goblin cannot prevail on this theory.

Trial Opinion at 14.

> I perceive the remedy limitations in the Standby Agreements as supplementary to the Proietto Notes, not contradictory. Paragraphs 3 and 4 of the Proietto-Sabertooth Standby Agreement did not alter the amount of the loan, the interest rate or the term of the loan. They merely deferred the Proiettos' right to exercise their default remedies provided by the parties' agreement. This further supports the conclusion that the Standby Agreements supplemented the Proietto Notes and that the Notes were not fully integrated.

Trial Opinion at 19. The Bankruptcy Judge then went on to consider whether the parties

intended to incorporate all of the remedy restrictions of the Standby into the Notes or merely the

"two year" and the Cash Flow Minimum Ratio restriction found in Paragraph 1 of the Standby.

Based on the trial evidence, the Bankruptcy Judge found that the parties intended to include in

the GGI Note the restrictions on the Proiettos remedial rights set forth in Paragraphs 3 and 4 of

the Standby:

> [E]ven taking into account the textual infirmities in the Proietto-Green Goblin Note, I find that the parties intended to include in the Proietto-Green Goblin Note the restrictions on the Proiettos remedial rights set forth in Paragraphs 3 and 4 of the Sabertooth Standby Agreement.
>
> The Transaction was designed to be and was an integrated commercial loan transaction. The Proietto-Green Goblin Note was only one (1) of a group of related contracts all of which were executed to complete the closing on a multi-party commercial sales transaction that included two (2) commercial banks as lenders, the Proiettos as a private lender, Venom and Sabertooth as corporate guarantors and the Principals as personal guarantors. In order to protect its second priority mortgage on the Property, BLC required as a condition of granting its loan that the Proiettos subordinate the take back loan and that it be on standby. To that end, the Proiettos entered into the Standby Agreements which not only restricted repayment of the Proietto Notes but also limited the Proiettos' exercise of any legal remedies with respect to the Proietto Notes until BLC was paid in full. Without the Standby Agreements, the loan between BLC and the Former Debtors would not have closed.
>
> The record makes clear that the parties discussed the terms and scope of the Standby Agreements at the May 2001 meeting and Joseph Proietto agreed to be bound according to those terms. As stated earlier, when he drafted the Proietto Notes, [Attorney] Hughes believed that he was incorporating the terms of the Standby Agreements in revising the Notes to make reference to the Standby Agreements. His execution of his task (i.e., his actual drafting)

11

may have been faulty, but there is no reason to believe that the Proiettos thought that [the] text of the Proietto Notes was intended to draw a distinction between the Proietto Notes and the Standby Agreements. The Proiettos were told at the meeting in May 2001 that they would have to execute Standby Agreements, pursuant to which they would be deferring the right to be repaid as well as their right to exercise contract default remedies; otherwise, BLS would not provide the necessary financing. Why would the Proiettos expect that the Proietto Notes, which made reference to the Standby Agreements, would authorize them to take collection action that would place them in breach of their obligations to BLC under the Standby Agreements? There is no evidence that suggests that the Proiettos or the Former Debtors drew any such counterintuitive distinction between the Proietto Notes and the Standby Agreements.

Trial Opinion at 21-24.

Having found that the parties intended to include in the GGI Note the temporal restrictions on the Proiettos' remedial rights set forth in Paragraphs 3 and 4 of the Standby, the Bankruptcy Judge went on to consider the legal significance of that finding using principles of contract construction. He concluded:

Based [on] the testimony and the documents taken as a whole, I conclude that the provisions of the Standby Agreements operated as conditions within the Proietto Notes.

The Proietto-Green Goblin Note was a standard promissory note, albeit with certain limitations on the Proiettos' exercise of their collection remedies. The Proiettos fulfilled their end of the bargain by lending the money which triggered Green Goblin's legal duty to repay the loan. **The Proiettos retained their legal remedies in the event of a breach. The provisions of the Standby Agreements incorporated into the Proietto-Green Goblin Note simply addressed when those remedies could be utilized. The events that had to occur before the Proiettos could lawfully demand payment or exercise their default remedies were conditions, not independent legal duties undertaken by the Proiettos in favor of the Former Debtors.**

The evidence regarding the source and derivation of the various restrictions on the Proiettos' collection rights under the Proietto Notes strongly suggests that the Proiettos made no affirmative promise to the Former Debtors. BLC demanded those restrictions as a condition of entering into the financing arrangement in order to protect its second position mortgage on the Property and to maximize its ability to obtain repayment of

12

its loan. Through the Standby Agreements, the Proiettos made contractual promises to BLC, not the Former Debtors, and there is no evidence that the restrictions on the Proiettos collection rights mandated by the Standby Agreements were intended to benefit the Former Debtors. Therefore, when considered in context, when the Standby Agreement restrictions were included as limitations in [the] Proietto Notes, they were not affirmative promises made by the Proiettos to the Former Debtors. Rather, their incorporation was designed merely to harmonize the provisions of the Proietto Notes with the Standby Agreements. **As such, the restrictions functioned as conditions on the Proiettos' exercise of their right to repayment under the Notes.**

The foregoing analysis is supported by the text of the Proietto-Green Goblin Note. The operative words of the Proietto-Green Goblin Note state that in accordance with the Standby Agreement, payment of principal and interest is permitted only "after the occurrence" of two (2) years and the achievement of the Cash Flow Minimum Ratio. In the next sentence, the Note states that "[w]hen" principal and interest payments are permitted to be made under the Standby Agreement, all accrued interest and unpaid principal must be paid. Both of these quoted terms are restrictions based on either the passage of time or events that may or may not occur. This is the wording of a condition, not a promise. Had these [been] intended to be affirmative obligations, it would have been simple for the scrivener to have made those obligations clear.

Trial Opinion at 26-27 (emphasis added).

## VI.    SUBJECT MATTER JURISDICTION

Simons first argues that the Bankruptcy Judge's result, dismissing GGI's claim in the adversary action, can be affirmed on the ground that the court lacked subject matter jurisdiction over the GGI-Simons dispute. The <u>Rooker-Feldman</u> doctrine applies where: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." <u>Great Western Mining & Mineral Co. v. Fox Rothchild, LLP</u>, 615 F.3d 159, 166 (3d Cir. 2010) (citing <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005)).   Simons argues that

elements 2 and 4 are not at issue, and whether element 1 is satisfied is the dispositive inquiry

regarding GGI. He contends that the Bankruptcy Judge erred in finding that, since GGI was not

explicitly named as a defendant in the Complaint in Confession of Judgment in the Court of

Common Pleas of Montgomery County, it could not be a state court "loser" for Rooker-Feldman

purposes. Specifically, he argues that the Bankruptcy Judge misapplied the holding of Lance v.

Dennis, 546 U.S. 459 (2006), when he held that,

> Resolution of the Rooker-Feldman issue as to Green Goblin is simple. No
> prior judgment was entered against Green Goblin. Therefore, the Rooker-
> Feldman doctrine is inapplicable to Green Goblin's claims.
>
> Even in the absence of a judgment against Green Goblin, Simons
> contends that Green Goblin should be considered a "state court loser for
> Rooker–Feldman purposes." [ ]   Simons relies on the Second Circuit's
> decision in Hoblock [v. Albany County Board of Elections, 422 F.3d 77, 88
> (2d Cir. 2005)], in which the Court stated: "While . . . claim and issue
> preclusion are distinct from the Rooker-Feldman doctrine . . . federal case
> law governing the application of preclusion doctrines to nonparties should
> guide the analogous inquiry in the Rooker-Feldman context." Hoblock, 422
> F.3d at 90. Simon [sic] then argues that Sabertooth and Green Goblin are
> sufficiently "closely aligned," see id. at 91, as to put them in privity for
> purposes of preclusion and Rooker-Feldman.
>
> Simons' reliance on Hoblock is misplaced in light of the Supreme
> Court's decision in Lance v. Dennis, which was subsequent to Hoblock. In
> Lance, the Court held Rooker-Feldman inapplicable to a federal plaintiff who
> was not a party in the underlying state-court proceeding. Lance, 546 U.S. at
> 466, 126 S.Ct. 1198. The Court rejected the expansion of Rooker-Feldman to
> federal plaintiffs who were not parties to the prior litigation, observing that,
> "[w]hatever the impact of privity principles on preclusion rules, Rooker-
> Feldman is not simply preclusion by another name." Id.

Summary Judgment Opinion at 13-14 (internal citation omitted). Simons argues that Lance did

not go as far as the Bankruptcy Judge held, but merely "clarified that the 'doctrine does not bar

actions by nonparties to the earlier state-court judgment *simply because, for purposes of*

*preclusion law, they could be considered in privity with a party to the judgment*.'" Appellee Br.

at 19 (quoting <u>Lance</u>, 546 U.S. at 465-66) (emphasis in Brief).  Simons asserts that GGI and

Sabertooth were not merely in privity with each other, but were "essentially the same."  <u>Id</u>. at 20.

I find that the Bankruptcy Judge properly interpreted <u>Lance</u> and did not err in concluding that

there was subject matter jurisdiction over GGI's breach of contract claim against Simons.

In <u>Lance</u>, the Supreme Court stated:

> In <u>Exxon Mobil [Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280
> (2005)] decided last Term, we warned that the lower courts have at times
> extended Rooker-Feldman "far beyond the contours of the <u>Rooker</u> and
> <u>Feldman</u> cases, overriding Congress' conferral of federal-court jurisdiction
> concurrent with jurisdiction exercised by state courts, and superseding the
> ordinary application of preclusion law pursuant to 28 U.S.C. § 1738."  544
> U.S., at 283, 125 S.Ct. 1517.  <u>Rooker-Feldman</u>, we explained, is a narrow
> doctrine, confined to "cases brought by state-court losers complaining of
> injuries caused by state-court judgments rendered before the district court
> proceedings commenced and inviting district court review and rejection of
> those judgments."  544 U.S., at 284, 125 S.Ct. 1517.
>
> Although we have never addressed the precise question before us, we
> have held <u>Rooker-Feldman</u> inapplicable where the party against whom the
> doctrine is invoked was not a party to the underlying state-court proceeding.
> <u>See</u> [Johnson v.] De Grandy, [512 U.S. 997 (1994)] <i>supra</i>, at 1006, 114 S.Ct.
> 2647.  In <u>De Grandy</u>, the State of Florida sought, using <u>Rooker-Feldman</u>, to
> prevent the United States from bringing a challenge under § 2 of the Voting
> Rights Act of 1965 to the reapportionment of state electoral districts.  The
> Florida Supreme Court, in an action initiated by the state attorney general,
> had already declared the law valid under state and federal law.  We held that
> <u>Rooker-Feldman</u> did not bar the United States from bringing its own action in
> federal court because the United States "was not a party in the state court,"
> and "was in no position to ask this Court to review the state court's judgment
> and has not directly attacked it in this proceeding."  512 U.S., at 1006, 114
> S.Ct. 2647.
>
> In the case before us, the plaintiffs were plainly not parties to the
> underlying state-court proceeding in [People ex. Rel. Salazar v. Davidson, 79
> P.3d 1221 (Colo. 2003)].  <u>Salazar</u> was an action brought by the state attorney
> general against the secretary of state, in which the Colorado General
> Assembly intervened.  79 P.3d, at 1227.  The four citizen-plaintiffs here did
> not participate in <u>Salazar</u>, and were not in a "position to ask this Court to
> review the state court's judgment."  <u>De Grandy</u>, <i>supra</i>, at 1006, 114 S.Ct.
> 2647; <u>see Karcher v. May</u>, 484 U.S. 72, 77, 108 S.Ct. 388, 98 L.Ed.2d 327

(1987) ("[T]he general rule [is] that one who is not a party or has not been treated as a party to a judgment has no right to appeal therefrom").

Although the District Court recognized the "general rule" that "Rooker-Feldman may not be invoked against a federal-court plaintiff who was not actually a party to the prior state-court judgment," 379 F.Supp.2d, at 1123, it nevertheless followed Tenth Circuit precedent in allowing application of Rooker-Feldman against parties who were in privity with a party to the earlier state-court action, 379 F. Supp. 2d, at 1123 (citing Kenmen Eng. v. Union, 314 F.3d 468, 481 (2002)). In determining whether privity existed, the court looked to cases concerning the preclusive effect that state courts are required to give federal-court judgments. 379 F.Supp.2d, at 1125 (citing Washington [v. Washington State Commercial Passenger Fishing Vessel Ass'n], 443 U.S., at 693, n. 32, 99 S.Ct. 3055; [City of Tacoma v.] Taxpayers of Tacoma, 357 U.S., at 340-341, 78 S.Ct. 1209). It concluded that — for Rooker-Feldman as well as preclusion purpose — "the outcome of the government's litigation over a matter of public concern binds its citizens." 379 F.Supp.2d, at 1125.

The District Court erroneously conflated preclusion law with Rooker-Feldman. Whatever the impact of privity principles on preclusion rules, Rooker-Feldman is not simply preclusion by another name. The doctrine applies only in "limited circumstances," Exxon Mobil, *supra*, at 291, 125 S.Ct. 1517, where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court. The Rooker-Feldman doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment.

Lance, 546 U.S. at 464-66. The Court went on to note that,

In holding that Rooker-Feldman does not bar the plaintiffs here from proceeding, we need not address whether there are any circumstances, however limited, in which Rooker-Feldman may be applied against a party not named in an earlier state proceeding — e.g., where an estate takes a de facto appeal in a district court of an earlier state decision involving the decedent.

Id. at 466 n.2. Simons argues that the Bankruptcy Judge failed to consider this final caveat. It argues that because Sabertooth and GGI were "essentially the same" the situation falls within the caveat.

16

I find that this argument has no merit. First, Simons points to no evidentiary basis for concluding that Sabertooth and GGI are "essentially the same." While the Debtors were incorporated by the same Principals, they are separate corporate entities and there is no assertion that the Bankruptcy Judge had a basis under Pennsylvania law to ignore their separate existences. See Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995) (stating there is a strong presumption against piercing the corporate veil, as doing so undermines the well-established rule that corporations enjoy a legal existence separate from their owners). Simons states no basis for concluding that the entities were alter egos, such as evidence of the failure to observe corporate formalities, the siphoning of funds from one to the other corporation by the Principals, the absence of corporate records, or whether the corporation is a mere facade for the operations of a common shareholder or shareholders. See generally Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F. Supp. 1054, 1059 (W.D. Pa. 1990). He also states no basis for concluding that one had successor liability to the other. See generally Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc., 42 A.3d 951 (Pa. 2012).

Second, the relationship between Sabertooth and GGI does not equate to the type of relationship mentioned in the Lance Court's footnote. Where an estate takes a de facto appeal in a district court of an earlier state decision involving a decedent, the Rooker-Feldman doctrine might apply because the estate has legally succeeded to the interests of the decedent. That is not this case.

Accordingly, I conclude that the Bankruptcy Judge properly exercised subject matter jurisdiction over the adversary action between GGI and Simons, as does this Court on appeal.

17

## VII.   GGI's CLAIMS OF ERROR

A.   The Bankruptcy Judge improperly engaged in contract construction; the determination that the remedy restrictions were not contractual promises was substantively flawed.

GGI first argues that the Bankruptcy Judge erred by employing principles of contract construction, rather than contract interpretation, to determine that the remedy restriction merely provided GGI with a defense to Simons' collection action, rather than a cause of action for breach. Specifically, it argues that it was undisputed that Simons violated Paragraphs 3 and 4 of the Standby Agreement; at trial the issue to be resolved was whether the parties intended to incorporate those provisions into the GGI Note. It continues that, once the Bankruptcy Judge determined, using the law of contract interpretation, that the parties did so intend to incorporate those remedy restrictions, that should have been the end of the analysis. GGI argues that the Bankruptcy Judge erred in using contract construction principles to resolve an issue of law that was never raised by the parties, namely whether the remedy restrictions were affirmative covenants or merely an affirmative defense/condition precedent to Simons' right of enforcement. GGI argues that the Bankruptcy Judge fashioned an ambiguity were none existed.

As a general principle of contract law, when there is a dispute over the parties' intent as to the meaning of an ambiguous contractual provision, it is a matter of contract interpretation to be submitted to the fact finder. Antkowiak v. TaxMasters, 455 Fed. App'x 156, 162 (3d Cir. 2011). Matters of contract construction, however, are issues of law to be resolved by the court. Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 229-30 (3d Cir. 2007) (citing John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 659 (3d Cir. 1986) ("Contract interpretation is a

18

question of fact . . . .  [C]ontract construction is a question of law . . . .")).  The distinction

between contract interpretation and contract construction "is not always easy."  John F. Harkins

Co. 796 F.2d at 659.  "'Construction, which may be usefully distinguished from interpretation, is

a process by which legal consequences are made to follow from the terms of the contract and its

more or less immediate context, and from a legal policy or policies that are applicable to the

situation.'"  Ram Constr. Co. v. Am. States Ins. Co., 749 F.2d 1049, 1053 (3d Cir. 1984)

(quoting Edwin W. Patterson, The Interpretation and Construction of Contracts, 64 Colum.

L.Rev. 833, 835 (1964)).  The Third Circuit has stated:

> "By 'interpretation of language' we determine what ideas that language
> induces in other persons.  By 'construction of the contract,' as that term will
> be used here, we determine its legal operation — its effect upon the action of
> courts and administrative officials.  If we make this distinction, then the
> construction of a contract starts with the interpretation of its language but
> does not end with it; while the process of interpretation stops wholly short of
> a determination of the legal relations of the parties."

John F. Harkins Co. 796 F.2d at 659 (quoting 3 Arthur Linton Corbin, Corbin on Contracts §

534, at 9 (2d ed.1960)).  Put most simply, contract interpretation refers to determining the

meaning of contract terms — the resolving of questions of fact; contract construction refers to

determining the legal operation of a contract — the resolving of questions of law.  See Horng

Tech. Ent. Co. v. Sakar Int'l, Inc., 432 F. App'x 172, 175 n.2 (3d Cir. 2011).

I find that GGI's argument that the Bankruptcy Judge improperly engaged in contract

construction to reach the conclusion that the Standby constituted only a condition precedent to

Simons' right to exercise his default remedies is meritless.  GGI cites no authority for the

proposition that a court is prohibited from engaging in contract construction when it is required

to adjudicate the question of breach, particularly when the court is both the judge of the law and

the fact finder.  As related above, the Bankruptcy Judge attempted to determine in the Summary

Judgment Opinion the legal operation of the contracts. He found that genuine issues of fact prevented a legal determination under Restatement § 216(2) on whether or not the GGI Note was fully integrated. He found, based on "the nature of the transaction as a whole," that the restriction from the Standby simply may have been omitted from the GGI Note notwithstanding the parties' intent to include the provision, because it would not be reasonable that the Proiettos would contract with GGI and Sabertooth for the right to exercise their remedies in ways that would breach their contract with BLC. The purpose of the trial was to resolve these factual issues so that the legal consequences could be finally determined.

Based on the evidence adduced at trial, the Bankruptcy Judge, now acting as both fact finder and judge of the law, determined that the remedy limitations in Paragraphs 3 and 4 of the Standby were not contradictory to the Notes because they did not alter the key terms of the Notes. Rather, they merely deferred the Proiettos' right to receive payments provided by the parties' agreement, supporting "the conclusion that the Standby Agreements supplemented the Proietto Notes and that the Notes were not fully integrated." He based this conclusion on evidence that: (1) the transaction was designed to be and was an integrated commercial loan transaction, with the Proietto-GGI Note being only one of a group of related contracts all of which were executed to complete the closing of a multi-party commercial sales transaction; (2) BLC, in order to protect its second priority mortgage, required that the Proiettos subordinate their third priority mortgage; and (3) the Proiettos entered into the Standby Agreements, which not only restricted repayment to them of the Notes, but also limited their exercise of any legal remedies with respect to the Notes, until BLC was paid in full. The Bankruptcy Judge found as a matter of fact that, without the Standby, the loan between BLC and the Former Debtors would

20

not have closed, and that there was no evidence suggesting that the Proiettos or GGI drew any counterintuitive distinctions between the GGI Note and the Standby.  Trial Opinion at 21-24.

Having found as fact that the parties intended to include in the GGI Note the temporal and cash flow restrictions on the Proiettos' exercise of their remedial rights, as set forth in Paragraphs 3 and 4 of the Standby, the Bankruptcy Judge went on to consider the legal operation of the parties' agreement by using principles of contract construction.  He found that the terms identifying when the Proiettos could exercise their default remedies constituted conditions precedent to the exercise of those remedies, and not independent legal duties.  He based this conclusion in part on evidence that (1) it was BLC that demanded the Proiettos submit to those remedy restrictions, not GGI; (2) in the Standby, the Proiettos made contractual promises only to BLC, not GGI, and there was no evidence that the restrictions on the Proiettos' remedy rights mandated by the Standby were intended to benefit GGI.  He concluded as a matter of law that the restrictions functioned only as conditions on the Proiettos' exercise of their right to repayment under the Notes because: (1) the parties intended to harmonize the provisions of the Proietto Notes with the Standby; (2) the operative words of the GGI Note state that in accordance with the Standby Agreement, payment of principal and interest is permitted only "after the occurrence" of the temporal and cash flow conditions; and (3) all accrued interest and unpaid principal was required to be paid within five years.  He concluded as a matter of law that the legal operation of both of the temporal and cash flow terms "were restrictions based on either the passage of time or events that may or may not occur.  This is the wording of a condition, not a promise.  Had these intended to be affirmative obligations, it would have been simple for the scrivener to have made those obligations clear."  Trial Opinion at 26-27.

21

I find there was no error in the Bankruptcy Judge's ultimate conclusion that the limitation on Simons' remedy rights contained in the Standby was only a condition precedent to the exercise of those rights, and was not an independent legal duty vis-à-vis GGI to act or defer from acting. It must be remembered that Simons' remedy rights arose from the Sabertooth Mortgage, to which GGI was not a party, and only that document provided for the confession of judgment remedy. The restrictions on the Proiettos' remedy rights was contained in the Standby, to which GGI was also not a party (and to which it was determined not to be a third party beneficiary). The only direct promise the Proiettos made to GGI was to defer receipt of payments of principal and interest under the GGI Note. That promise had a definite and unambiguous time limit: all principal and interest was due no later than five years, regardless of any other contract provision. While GGI argues that there was no express language in the Standby or the GGI Note that qualified the remedy restrictions as conditions precedent, since the Proiettos made no direct promise **to GGI** not to exercise remedies **against Sabertooth**, GGI has not shown that (1) it was clear error for the Bankruptcy Judge to find as fact that the parties intended to have the restrictions of the Standby be integrated into the GGI Note, or (2) he erred in his legal conclusion that those restrictions constituted only conditions precedent to Simons' exercise of his remedy rights.

B.     The Bankruptcy Judge improperly raised the affirmative defense *sua sponte*.

Finally, GGI argues that it was error for the Bankruptcy Judge to raise "an issue of affirmative defense." It asserts that the Bankruptcy Judge's conclusion that the provisions of the Standby created only a condition precedent rather than an actual promise asserted an affirmative defense for Simons to GGI's breach of contract claim that Simons never raised himself, and to

which GGI had no notice and opportunity to address. This assertion is meritless for several reasons. First, this entire argument is a categorical error. The Bankruptcy Judge did not hold that the remedy restrictions constituted an affirmative defense for this cause of action; i.e. that Simons had an affirmative defense to GGI's breach of contract action that he failed to raise. The Bankruptcy Judge found that the remedy restrictions could be an affirmative defense belonging to GGI in the confession of judgment action in state court. As for this cause of action for breach, he found that the Proiettos had never made a promise to GGI not to exercise remedies under the Sabertooth Mortgage; because there was no promise there was a failure of proof on GGI's breach of contract claim. This is simply not an instance of a court setting up an affirmative defense to the cause of action *sub judice* that was never raised by the defendant.

Second, given the manner in which the Bankruptcy Judge framed the issue remaining for trial in the Summary Judgment Opinion, I find that GGI was on notice that the issue of the parties' intention regarding the integration of the terms of the Standby into the GGI Note, and the legal consequences arising therefrom, were to be litigated. See Summary Judgment Opinion at 39 ("there is a fact issue whether the parties intended to incorporate all of the restrictions found in the Sabertooth Standby Agreement into the Proietto-Green Goblin Note. . . . In the totality of the circumstances of the transaction, I find that there is sufficient uncertainty regarding the relationship between the Proietto Notes and the Standby Agreements to create a triable issue of fact."). Finally, any due process/notice and opportunity issue allegedly arising from the fact that the Bankruptcy Judge resolved the matter based on a legal rationale not specifically addressed by parties was mooted when GGI moved for reconsideration of the decision under Fed. R. Civ. P. 59(e) and Fed. R. Bankr. P. 9023. See Bobian v. CSA Czech Airlines, 222 F. Supp. 2d 598, 601-

23

602 (D.N.J. 2002) (holding that alleged due process violation occurring where a motion is granted without first giving non-moving party an opportunity to file a brief in opposition to the motion is mooted where non-moving party moves for reconsideration and is given opportunity to argue whether decision was appropriate).

## VIII.   CONCLUSION

For the reasons stated, the decision of the Bankruptcy Judge finding for Appellee Simons on GGI's breach of contract claim is affirmed.

An appropriate Order follows.

BY THE COURT:

LAWRENCE F. STENGEL, J.